UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHANNON HAYES,

                        Plaintiff,

        – against –

G&E REAL ESTATE MANAGEMENT
SERVICES D/B/A NEWMARK,

                        Defendant.

**OPINION & ORDER**

24-cv-01459 (ER)

Ramos, D.J.:

Shannon Hayes brings suit against G&E Real Estate Management Services d/b/a
Newmark ("Newmark"), alleging employment discrimination and retaliation in violation
of 42 U.S.C. § 1981. Before the Court is Newmark's motion to dismiss for failure to
state a claim upon which relief can be granted. Doc. 34. For the reasons discussed
below, the motion is DENIED.

## I.    BACKGROUND

### A. Factual Background

The following facts are taken from Hayes' First Amended Complaint, Doc. 13,
which the Court accepts as true for the purpose of Newmark's Rule 12(b)(6) motion. *See
Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Hayes identifies as an African American woman and Maryland resident. Doc.
13 ¶¶ 1, 6. On October 21, 2019, Hayes began working as an Assistant Facilities
Manager for Newmark. *Id.* ¶ 7. As an Assistant Facilities Manager, Hayes "managed
[Newmark's] offices, including two in Washington D.C." and earned an annual salary of
$58,000. *Id.* ¶¶ 8, 9. According to Hayes, her duties included working with vendors,
preparing budget and variance reports, and writing certificates of insurance, monthly
operating reports, contracts with vendors, and weekly briefings. *Id.* ¶ 9. Hayes also
conducted building inspections and inventory inspections. *Id.*

Hayes alleges that she was an excellent employee at all times and that from 2019 to 2020 she received "overwhelmingly positive" performance reviews. *Id.* ¶¶ 10, 11. As a result of a positive performance review in 2020, she received a $3,000 raise. *Id.* ¶ 11. Until March 2020, Hayes reported to Jason Hughes. *Id.* ¶ 12.

In May 2020, Newmark hired Cheryl Winkelmann, a white woman. *Id.* ¶ 13. At that time, Hayes began reporting to Winkelmann as her primary supervisor. *Id.*

Between May and July 2020, Hayes made multiple requests for paid time off ("PTO"), which were all denied by Winkelmann. *Id.* ¶¶ 13, 14. Hayes alleges that requests for PTO by non-African American employees were being granted during the same time period that her requests were denied. *Id.* ¶ 14.

In July 2020, in response to the denials of her PTO requests, Hayes made a complaint of racial discrimination to Tara Molnar, a Vice President of Newmark. *Id.* Hayes believed that Winkelmann was denying her PTO requests because of her race because non-African American employees were granted their PTO requests. *Id.*

In September 2020, Hayes requested PTO to attend a "Black Lives Matter" rally in Washington D.C. *Id.* ¶ 15. In response to her request, Winkelmann approached Hayes and told her that "Black lives don't matter." *Id.* ¶ 16. Hayes informed Winkelmann that her comment was inappropriate for the workplace, and Winkelmann responded by saying "this conversation is appropriate because Black lives do not matter." *Id.* ¶¶ 16–18.

In October 2020, during an individual meeting with Hayes, Winkelmann informed her of the enrollment period for employer provided health insurance, and told Hayes that she "better enroll in the company insurance because it is better than Obamacare." *Id.* ¶ 20. Hayes alleges that Winkelmann also told her that she "better get it together or [she] will be looking for another job." *Id.* ¶ 22.

Later that month, Hayes made a complaint against Winkelmann with Glenn Flavinn, Senior Facilities Manager. *Id.* ¶ 24. During a meeting with Flavinn, Hayes alleges that she attempted to explain her concerns with Winkelmann's allegedly

discriminatory behavior, but Flavinn stopped her midsentence and told her that "Cheryl [Winkelmann] does not have a negative bone in her body.  I am not having this conversation, this is the end of it."  *Id.*  Hayes alleges that Flavinn and Winkelmann are also close personal friends.  *Id.* ¶ 25.

In November 2020, Hayes attempted to speak with Flavinn again about Winkelmann's conduct.  *Id.* ¶ 26.  Flavinn subsequently informed Winkelmann about Hayes' attempted contact with him.  *Id.*  Winkelmann then told Hayes that if she wished to speak with Flavinn, she would need to go through Winkelmann first.  *Id.*  Hayes alleges that this command was against Newmark's internal anti-discrimination policies.  *Id.* ¶ 27.

In December 2020, during a performance review with both Flavinn and Winkelmann, Hayes attempted to raise the discrimination complaint again, but was prevented from doing so.  *Id.* ¶ 28.  Hayes does not allege that this performance review was negative, and it is unclear whether this was one of the positive performance reviews that led to her raise.  *Id.* ¶¶ 11, 28.

In February 2021, Flavinn left Newmark, leaving the Senior Facilities Manager position vacant until May 2021.  *Id.* ¶ 29.

In May 2021, Hayes contacted Molnar to complain again that Winkelmann was denying her PTO requests.  *Id.* ¶ 30.  Molnar referred the matter to Pete Crumback, Facilities Director.  *Id.*  In conversations with Crumback, Winkelmann allegedly told him that she was unable to approve the requests because of software issues.  *Id.*  Hayes alleges that Crumback contacted IT who looked into the issue and informed Molnar that there was nothing wrong with the software that was preventing Winkelmann from approving the PTO requests.  *Id.*

Molnar allegedly instructed Winkelmann to approve Hayes' requests for PTO; however, Winkelmann continued to deny all of Hayes' requests.  *Id.* ¶¶ 30, 31.

In July 2021, Hayes met with Molnar again to complain about discrimination and the continued denial of PTO requests by Winkelmann. *Id.* ¶ 32. Molnar informed Hayes that she would refer the matter to Human Resources ("HR"), but Hayes alleges that HR never contacted her. *Id.* Molnar later reached out to Hayes and informed her that she had spoken with Winkelmann who denied making the "Black lives don't matter" comment or any other comments concerning race. *Id.*

Although the complaint does not make clear when, Hayes subsequently informed Molnar that because the Senior Facilities Manager vacated by Flavinn remained open, she would like to apply for the position in Washington D.C. *Id.* ¶ 33. Hayes also said that she would accept the position at the same pay rate as her current position as Assistant Facilities Manager. *Id.*

Molnar informed Hayes that the Washington D.C. office, and the East Region did not need a Facilities Manager.[1] *Id.* ¶ 34. Lisa Moore, a white woman, was "soon after" promoted from Assistant Facilities Manager to Facilities Manager for the East Region. *Id.* Hayes alleges that upon receiving the promotion, Moore called Hayes to inform her of the promotion and said "I don't know shit, but they promoted me." *Id.* Moore received a pay raise as part of the promotion. *Id.* ¶ 35.

In September 2021, Hayes submitted an expense report for the period of May through July 2021. *Id.* ¶ 36. Winkelmann refused to approve Hayes' expense report, and instead accused Hayes of filing a fraudulent report and reported her to HR. *Id.* However, following an investigation, HR concluded that Hayes' expense report was not fraudulent. *Id.* ¶¶ 36, 37. Hayes alleges that Winkelmann did not make any similar allegations against white employees under her supervision. *Id.* ¶ 38.

Also in September 2021, Ben Leake was hired as Senior Facilities Manager for the East Region. *Id.* ¶ 39. Hayes alleges that Winkelmann isolated her from Leake and

---

[1] The Washington D.C. office is a part of the East Region. *Id.* n. 4.

did not inform her of meetings with Leake concerning important matters related to her job duties.  *Id.* ¶ 40.

On December 7, 2021, Hayes met with Leake and Winkelmann for a performance review.  *Id.* ¶ 42.  Hayes alleges that they gave her a negative performance review and that this cost her the opportunity to earn a bonus and potential raise.  *Id.*  Hayes "suspects" that this negative performance review cost her between $4,000 and $5,000. *Id.*  Hayes also alleges that the negative performance review was a result of her prior complaints of discrimination and her December 30, 2021 filing with the U.S. Equal Employment Opportunity Commission ("EEOC").  *Id.*; Doc. 36-2.

Although Hayes alleges that she filed the complaint with the EEOC in September 2021, Doc. 13 ¶ 41, the complaint, which is before the Court, reflects that it was not filed until December 30, 2021.  Doc. 36-2.[2]  Therefore, the allegation that Newmark received notice of her complaint at some point between September 2021 and December 2021 prior to her negative performance review is not possible.  Doc. 13 ¶ 41; Doc. 36-2.  This Court has held that the truth of factual allegations that are contradicted by properly considered documents need not be accepted on a motion to dismiss.  *See, e.g.*, *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388, 396 (S.D.N.Y. 2005) (citing *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)); *BYD Company Ltd., v. VICE Media LLC*, 531 F. Supp. 3d 810, 825 (S.D.N.Y. 2021).

---

[2] The Court may consider Hayes' EEOC Charge of Discrimination without converting the motion to one for summary judgement because it is "a public document filed in an administrative proceeding, and is integral to plaintiff's [discrimination] claims … ."  *Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 586 n. 8 (S.D.N.Y. 2017) (internal quotation marks omitted) (quoting *Jordan v. Forfeiture Support Associates*, 928 F. Supp. 2d 588, 591 n. 1 (E.D.N.Y. 2013) ("Although plaintiff's EEOC Charge was submitted by defendant, the [c]ourt takes judicial notice of [p]laintiff's EEOC charge on a motion to dismiss." (citation and internal quotation marks omitted))); *see also Morris v. Broadridge Financial Services, Inc.*, No. 10-cv-1707 (JS) (AKT), 2010 WL 5187669, at *3 n. 2 (E.D.N.Y. Dec. 14, 2010) ("The Court takes judicial notice of Plaintiff's EEOC charge on a motion to dismiss.").

In February 2022, Hayes and Newmark attended a mediation before the EEOC concerning her allegations of discrimination, harassment, and retaliation.  *Id.* ¶ 43.  The mediation was unsuccessful.  *Id.*  Hayes alleges that Newmark and Winkelmann retaliated against her after the mediation.  *Id.*  For example, Hayes alleges that Newmark and Winkelmann refused to meet with her concerning her job duties and performance. *Id.* ¶ 44.  Additionally, Hayes alleges that Winkelmann withheld instructions and deadlines for projects she was involved with, gave her "dummy work" and menial tasks, increased scrutiny of her work, and reported her to Amy O'Brian in HR for reasons not identified in the complaint.  *Id.* ¶ 45.  According to Hayes, O'Brian then told her that "we are trying to come up with a solution to make Cheryl [Winkelmann] comfortable so she can work with you."  *Id.*

In March 2022, Hayes informed Molnar and Crumback that since her filing and mediation with the EEOC, Winkelmann's behavior had gotten worse.  *Id.* ¶ 46.

In April 2022, Crumback informed Hayes that she was not allowed to communicate with anyone other than Winkelmann and that if "I [Crumback] find out that you have communicated with anyone other than [Winkelmann] I will fire you on the spot! I will also fire you immediately, even if you say Hi to anyone!"  *Id.* ¶ 47.

That month, Newmark hired Christine Geitner as a Facilities Manager.  *Id.* ¶ 48. Because Hayes would soon be reporting to Geitner, Hayes attempted to obtain her contact information.  *Id.*  When Winkelmann discovered this, she allegedly became irate and instructed Hayes not to contact Geitner.  *Id.*

Hayes alleges that based on the events described above, she was convinced her termination was imminent and resigned in May 2022.  *Id.* ¶ 49.

### B. Procedural Background

Hayes filed this action against RELX d/b/a Lexis-Nexis ("Lexis-Nexis")[3] and Newmark in Superior Court for the District of Columbia on January 23, 2023. *See* Doc. 1. The claim was removed to the United States District Court for the District of Columbia on March 22, 2023. Doc. 1. On April 12, 2023, Newmark moved to transfer the case to the United States District Court for the Southern District of New York based on the forum selection clause in Hayes' employment agreement, or alternatively to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6). Doc. 9. Lexis-Nexis filed a motion to dismiss that same day. Doc. 10.

In response, Hayes amended the complaint on May 12, 2023, naming Newmark as the sole defendant. Doc. 13. On June 2, 2023, Newmark renewed its motion to transfer the case to the United States District Court for the Southern District of New York, or alternatively to dismiss the complaint for failure to state a claim. Doc. 14. On February 5, 2024 the District Court for the District of Columbia granted Newmark's motion to transfer, without ruling on the motion to dismiss. Doc. 19.

On April 18, 2024, Newmark filed its motion to dismiss the complaint for failure to state a claim. Doc. 34.

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[3] In Hayes' original complaint, she identified Lexis-Nexis as her joint employer with Newmark. Doc. 1-1 at 1. While Hayes worked at a physical Lexis-Nexis office in Washington D.C., Lexis-Nexis is a client of Newmark to whom Newmark provides property management services. *See* Doc. 1-1 ¶¶ 1–3; Doc. 9-1 at 3 n. 2. Hayes removed Lexis-Nexis as a defendant in her amended complaint after Lexis-Nexis filed a motion to dismiss arguing it was not her joint employer. *See* Doc. 10-1 at 5–7.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must " 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.    DISCUSSION

Hayes alleges that Newmark discriminated against her based on her race and retaliated against her for her participation in protected activity in violation of 42 U.S.C. § 1981. The Court will address each claim in turn.

### A.  Framework for § 1981 Discrimination and Retaliation Claims

Hayes' § 1981 claims for employment discrimination and retaliation are both analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (applying the *McDonnell* framework to § 1981 claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) ("[A] retaliation claim follows the familiar [*McDonnell*] burden-shifting framework developed to evaluate allegations of disparate treatment."). The *McDonnell* framework requires that a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell*, 411 U.S. at 802. If a plaintiff successfully establishes a *prima facie* case, the

burden shifts to the defendant who must then rebut the presumption by offering a legitimate non-discriminatory reason for the adverse employment action in plaintiff's *prima facie* case. *Id.* at 802–03. If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the reason given by the defendant is pretextual. *Id.* at 804. At the pleading stage, however, the facts alleged must merely "give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of … litigation." *Littlejohn*, 795 F.3d at 311. Thus, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a *prima facie* case. *Ramirez v. Temin & Company, Inc.*, No. 20-cv-6258 (ER), 2021 WL 4392303, at * 5 (S.D.N.Y. Sept. 24, 2021).

### B. Discrimination

To establish a § 1981 *prima facie* discrimination claim, Hayes must show that: (1) she is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discriminatory intent. *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003)). Although a plaintiff is not required to plead facts proving each element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide "plausible support" for a "minimal inference" that the employer was motivated by discriminatory intent. *Littlejohn*, 795 F.3d at 311. When evaluating whether a complaint meets this standard, the Court "must be mindful of the 'elusive' nature of intentional discrimination." *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 86 (2d Cir. 2015) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981)). "[R]arely is there direct, smoking gun, evidence of discrimination," and so a plaintiff "usually must rely on bits and pieces of information to support an inference of discrimination, *i.e.,* a mosaic of intentional discrimination." *Id.* (citation and internal quotation marks omitted). Nonetheless, the

allegations must be fact-specific.  *See Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011).  Conclusory or naked allegations will not do.  *See id.*

The parties do not dispute that Hayes satisfies the first two elements—i.e., that as an African American woman she was a member of a protected class, and that she was qualified for her position.  The parties, however, disagree over whether Hayes suffered an adverse employment action, and if she did, whether the underlying circumstances give rise to an inference of discriminatory intent.

Newmark argues that for an employment action to be considered adverse, it must be a " 'materially adverse change' in the terms and conditions of employment."  Doc. 35 at 10 (quoting *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted)).  Although Newmark is correct that the Second Circuit previously imposed a materiality requirement when evaluating adverse employment actions, the "landscape has changed with the Supreme Court decision in *Muldrow v. City of St. Louis* [601 U.S. 346] (2024)."  *Ciotti v. City of New York*, No. 23-cv-10279 (ER), 2025 WL 308022, at *12 (S.D.N.Y. Jan. 27, 2025) (quoting *Anderson v. Amazon.com, Inc.*, No. 23-cv-8347 (AS), 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024)).

In *Muldrow*, the Supreme Court rejected the notion that in Title VII cases "the harm incurred [must be] significant … [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."  601 U.S. at 355 (citation and internal quotation marks omitted).  After *Muldrow*, this Court considered "whether § 1981 differs from Title VII in some way that justifies a continued materiality rule."  *Anderson*, 2024 WL 2801986, at *10.  The Court reiterates today that it does not.  *See id.*; *Ciotti*, 2025 WL 308022, at *12 ("[T]he Court follows many others in extending the holding in *Muldrow* beyond only Title VII discrimination cases involving *transfers*.").  Indeed, the text of § 1981 is devoid of any indication that adverse actions must be material.  It states that "[a]ll persons … shall have the *same right* … to make and enforce contracts," and defines "make and enforce contracts" to include "the enjoyment

of *all* benefits privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (a)–(b) (emphasis added). Like Title VII, "[t]here is nothing in [§ 1981] to distinguish … between [adverse actions] causing significant disadvantages and [adverse actions] causing not-so-significant ones. … To demand 'significance' is to add words … to the statute Congress enacted. It is to impose a new requirement on a [§ 1981] claimant, so that the law as applied demands something more of her than the law as written." *Anderson*, 2024 WL 2801986, at *10 (quoting *Muldrow*, 601 U.S. at 355).

Although the adverse action does not need to be *materially* adverse, Hayes still must establish some harm concerning her employment terms or conditions. *Muldrow*, 601 U.S. at 354–55. Terms and conditions in an employment discrimination claim cover more than just "economic or tangible" factors and apply beyond a "narrow contractual sense," however, the plaintiff must allege some harm that has left her "worse off." *Id.* (citation omitted); *Ciotti*, 2025 WL 308022, at *13 (finding an adverse employment action where the plaintiff was required to engage in unwanted counseling sessions and was subjected to repetitive and unnecessary urine testing).

Even under *Muldrow*, moreover, not all workplace events that are unpleasant are adverse employment actions. *Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F. Supp. 3d 68, 91 (S.D.N.Y. 2024). For example, "mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment." *Id.* (quoting *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024)).

Here, Hayes alleges that Newmark took adverse action against her by giving her a negative performance review that she believes cost her an opportunity to earn a bonus or an increase in her salary. Doc. 13 ¶ 53. She also alleges that she was denied a promotion for a position that was given to a less qualified white woman. *Id.* ¶ 54. Finally, Hayes also alleges that Winkelmann discriminated against her by repeatedly preventing her from

taking PTO, falsely accusing her of fraud, and giving her menial tasks. Doc. 37 at 12–13. According to Hayes, these actions constituted adverse employment actions that were taken because of her race. Doc. 13 ¶ 56.

    *1. Negative Performance Review*

    Hayes contends that she sufficiently pleaded an adverse employment action in connection with the negative performance review she received in 2021 which she believes cost her the opportunity to earn an additional $4,000 to $5,000 in annual income. Doc. 13 ¶ 53. Hayes argues that because Newmark "awards bonus[es and raises] based on positive performance reviews and [that] in 2020, her salary was increased by $3,000 because of her positive performance review[]," the fact that she received a negative performance review in 2021 is sufficient to allege that she suffered a tangible loss. *See* Doc. 37 at 10–11; Doc. 13 ¶¶ 11, 42.

    "[A] negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action." *Smith v. New York City Department of Education*, No. 18-cv-8545 (PGG), WL 6307471, at *8 (S.D.N.Y. Nov. 25, 2019) (quoting *Siddiqi v. New York City Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008)). However, "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019); *see also Siddiqi*, 572 F. Supp. 2d at 367 ("[N]egative evaluations, standing alone without any accompanying adverse results, are not cognizable.") (quoting *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001)).

    Newmark is correct that *Muldrow* does not change the understanding that a negative performance review, without more, does not qualify as an adverse employment action. *See* Doc. 38 at 2–3. However, as the Court explained above, *Muldrow* made clear that "some harm respecting an identifiable term or condition of employment" covers more than just "economic or tangible" harms. 601 U.S. at 347, 359 (citation omitted)

("The [action] must have left her worse off, but need not have left her significantly so."). Accordingly, a negative performance review that does not result in immediate economic consequences may nonetheless qualify as adverse employment action because it leaves the employee worse off by dampening the prospects of a promotion, raise, or bonus. *See, e.g.*, *Anderson*, 2024 WL 2801986, at *11 (finding that plaintiff's placement on a performance improvement plan was an adverse action because it "adversely affected [her] benefits, privileges, terms, or conditions of employment by saddling her with more and worse tasks, tarnishing her permanent record, dampening her prospects of a promotion or raise, temporarily preventing her from transferring, excluding her from certain meetings and projects, and so on.").

Newmark argues that Hayes' allegations that her negative performance review cost her the opportunity for a raise or bonus are merely speculative. *See Ramirez*, 2021 WL 4392303, at *5 ("No matter what the pleading standard is, [a] complaint must at least contain enough factual allegations that are *not* made upon information and belief to 'raise a right to relief above the speculative level.' " (quoting *Gilford v. NYS Office of Mental Health*, No. 17-cv-8033 (JPO), 2019 WL 1113306, at *6 (S.D.N.Y. Mar. 11, 2019) (citation and internal quotation marks omitted)); *Lebowitz v. New York City Department of Education*, 407 F. Supp. 3d 158, 171 (E.D.N.Y. 2017) (explaining that the alleged consequences resulting from a negative evaluation "must go beyond mere speculation" to survive a motion to dismiss). The Court disagrees.

Here, Hayes alleges that bonuses, raises, and promotions are based on positive performance reviews. She also alleges that her positive performance reviews in 2020 resulted in a $3,000 raise. Although a positive performance review does not necessarily entitle an employee to a raise, bonus, or promotion, it is reasonable to infer that they are substantially less likely to be awarded when an employee receives a negative performance review. In other words, Hayes' negative review plausibly deprived her of the opportunity to receive a raise or bonus similar to the one she received in 2020.

Accordingly, the Court finds that Hayes has sufficiently alleged that she has suffered some harm resulting from the allegedly discriminatory negative performance review.

Hayes has also met her "*minimal* burden of showing facts suggesting an inference of discriminatory motivation … ." *Littlejohn*, 795 F.3d at 311.  Remarks made by colleagues may raise an inference of discrimination "if there is a nexus between the remarks and an adverse employment decision."  *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015).  To determine whether a colleagues remark is probative of discriminatory intent, courts consider four factors:  "(1) who made the remark (i.e. a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark …; and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process)."  *Id.* (quoting *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).

Here, Hayes alleges that Winkelmann made allegedly racist remarks in September 2020 when Winkelmann told her that "Black lives don't matter," and in October 2020 when Winkelman told her that the company insurance policy was "better than Obamacare."  Doc. 13 ¶¶ 16, 20.  Hayes alleges that Winkelmann later gave her an allegedly discriminatory performance review on December 7, 2021.  *Id.* ¶ 42.

Where, as here, the same supervisor who made the allegedly racist remarks also took the adverse action, it is much easier to find an inference of discrimination.  *See Anderson*, 2024 WL 2801986, at *11 (finding that the plaintiff met her minimal burden of suggesting an inference of discrimination where the "same bosses who made comments and took actions that were racially inflected also took the allegedly adverse actions."). However, the Court must also consider the other competing factors.  *See Henry*, 616 F.3d at 150 ("[W]e caution that none of these factors should be regarded as dispositive… [but] this framework will provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff … .").

14

Newmark argues that the passage of time between the remarks and the negative performance review weighs against an inference of discrimination. Doc. 35 at 13–14. This argument is undermined by the fact that Winkelmann also allegedly discriminated against Hayes between September 2020 and December 2021 by repeatedly denying PTO requests and wrongfully reporting her to HR for filing a fraudulent expense report. Doc 37 at 12–13. Regardless of whether these actions also constitute adverse employment actions, they provide relevant background evidence by shedding light on the context of Winkelmann's motivation and thus bolster Hayes' claim that Winkelmann treated her differently because of her race. *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 88 (2d Cir. 2015) ("[P]urpose may often be inferred from the totality of the relevant facts … ." (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Anderson*, 2024 WL 2801986, at *11; *Wright v. New York City Off-Track Betting Corp.*, No. 05-cv-9790 (WHP), 2008 WL 762196, at *4 (S.D.N.Y. Mar. 24, 2008) ("Stray discriminatory comments combined with significant disparate treatment can raise an inference of discrimination."). Accordingly, The Court finds that Winkelmann's allegedly racist remarks and discriminatory conduct, viewed together, support the minimal inference that Winkelmann gave Hayes a negative performance evaluation because of her race.

Newmark also argues that there cannot be an inference of discrimination because Hayes received an "overwhelmingly positive" performance review from Winkelmann. Doc. 35 at 13–14. However, Hayes makes no allegations that Winkelmann ever participated in a positive performance review. Although the complaint is not clear about who gave Hayes the positive reviews, the Court draws the reasonable inference that Hayes does not allege Winkelmann was the supervisor responsible for her positive performance reviews and subsequent raise. Indeed, aside from the negative review in December 2021, the only performance review that Hayes specifically references in her complaint is a December 2020 performance review with Winkelmann and Flavinn where

Hayes attempted to raise a complaint of discrimination against Winkelmann and was prevented from doing so. *Id.* ¶ 28.

Accordingly, the Court finds that Hayes has sufficiently pleaded that her negative performance constitutes an adverse employment action which occurred under circumstances giving rise to an inference of discrimination.

### 2. *Failure to Promote*

Hayes also alleges that she suffered an adverse employment action because she was denied a promotion that was given to a less qualified white woman. Doc. 37 at 15.

Hayes is correct that the failure to promote is an adverse employment action. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("[D]iscriminatory failure to promote falls within the core activities encompassed by the term adverse actions." (citation and internal quotation marks omitted)). In order to make out a failure to promote claim, a plaintiff must show that "(1) she is a member of a protected class; (2) she 'applied and was qualified for a job for which the employer was seeking applicants'; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998)).

In *Brown v. Coach Stores, Inc.*, the Second Circuit established that a plaintiff must allege that she "applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." 163 F.3d at 710. However, the Second Circuit has also made clear that "the [specific application] rule is not inflexible." *Inguanzo v. Housing & Services, Inc.*, No. 12-cv-8212 (ER), 2014 WL 4678254, at *12 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 F. App'x 91 (2d Cir. 2015) (quoting *Petrosino*, 385 F.3d at 227). The law recognizes that the facts of a particular case may sometimes make "a specific application a quixotic requirement." *Id.* Indeed, the requirement that a plaintiff show that she applied for a

specific promotion may be excused if she demonstrates that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino*, 385 F.3d at 227.

Hayes alleges that she expressed interest in applying for a Facilities Manager position in Washington D.C.  Doc. ¶ 33.  Hayes also allegedly said that she would accept the position at the same pay as her current position as Assistant Facilities Manager.  *Id.* After Hayes expressed interest in the D.C. position, Molnar informed her that neither the Washington D.C. office nor East Region needed a Facilities Manager.  *Id.* ¶ 34. According to Hayes, the Washington D.C. office is a part of the East Region.  *Id.* n. 4.

Shortly after Hayes expressed interest in applying for the Washington D.C. position, Lisa Moore, a white woman, was promoted from Assistant Facilities Manager to Facilities Manager for the East Region.  *Id.* ¶ 34.  Hayes alleges that upon receiving the promotion, Moore called Hayes to inform her of the promotion and said "I don't know shit, but they promoted me."  *Id.*

These facts do not plausibly allege that Hayes actually applied for a specific promotion, was rejected, and that someone outside of her protected class was given the position she applied for.  Although Hayes sufficiently alleges that she expressed interest in applying for the Washington D.C. position, she never alleges that she applied or expressed interest in applying for the East Region position.  Although Hayes does not make this argument, it is possible that Molnar's assertion that the East Region did not need a Facilities Manager and Moore's statement that she was promoted despite her lack of requisite experience can be understood together as suggesting that the vacancy was never posted and Hayes was unaware of the vacancy before the position was filled. However, because Hayes does not make any specific factual allegations to that effect and does not raise the argument in her opposition, the Court finds that Hayes did not apply for the position at issue.

Even if Hayes could establish that she applied for and was denied the East Region position given to Moore, Hayes does not make any allegations creating an inference of discrimination. *See Brodt v. City of New York*, 4 F. Supp. 3d 562, 570 (S.D.N.Y. 2014) (explaining that even if a plaintiff establishes a *prima facie* failure to promote claim, they still must still plausibly allege that they were rejected under circumstances giving rise to an inference of discrimination).

Here, Hayes never alleges that Winkelmann, who made the allegedly discriminatory remarks, had anything to do with the decision about who to hire as the Facilities Manager. *See Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 307 (2d Cir. 2021) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." (quoting *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009))). The only allegation connecting Winkelmann to any decision affecting Hayes' potential promotion is that promotions are based on positive performance reviews and that she received a negative performance review from Winkelmann. Doc. 13 ¶¶ 11, 42. However, Hayes' first negative performance review from Winkelmann did not come until after Hayes had expressed interest in applying for the D.C. position. *Id.* ¶ 33, 42. Accordingly, the Court does not discern an inference of discrimination in the decision to promote Moore to Facilities Manager for the East Region.

Hayes also argues that "the fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination … ." *Littlejohn*, 795 F.3d at 313. Hayes is correct, however, in *Littlejohn*, the Court was contemplating situations where an employer replaces a *terminated* or *demoted* employee with an individual outside of the employee's protected class. *Id.* at 312–13. That has not occurred here.

*3.  Other Adverse Actions*

Although the parties' briefs focus on the negative performance review and the failure to promote, Hayes also alleged Winkelmann discriminated against her by repeatedly denying her PTO requests, falsely accusing her of filing a fraudulent expense report, and giving her menial tasks to perform.  *See* Doc. 13; Doc. 37 at 12–13.  Although these actions might once have been deemed immaterial, *see Littlejohn*, F.3d at 312 n. 10, the adverse employment action standard articulated by the Supreme Court in *Muldrow* asks whether the action caused some harm altering the "enjoyment of" any "benefits, privileges, terms [or] conditions" of her employment contract, regardless of its significance.  *See Anderson*, 2024 WL 2801986, at *11 (quoting 42 U.S.C. § 1981).

The Court finds that at this stage, the repeated denial of Hayes' PTO requests also qualifies as an adverse action for the purposes of establishing a *prima facie* discrimination claim.  Hayes was denied multiple PTO requests in May, July and September 2020.  Doc. 13 ¶¶ 13–16.  In September 2020, when Hayes requested PTO to attend a "Black lives matter" rally in Washington D.C., Winkelmann allegedly told Hayes that "Black lives don't matter" and denied her request.  *Id.* ¶ 15–16.  In May 2021, Hayes complained to Molnar that Winkelmann was once again refusing to approve her PTO requests.  *Id.* ¶ 30.  Molnar referred the matter to Crumback who investigated the situation.  *Id.*  Winkelmann told Crumback that a software issue was preventing her from approving the requests, but an investigation revealed that there was nothing preventing Winkelmann from approving Hayes' requests.  *Id.*  Molnar then directed Winkelmann to approve Hayes' requests.  *Id.*  Nonetheless, Winkelmann continued to deny Hayes' requests for paid time off.  *Id.* ¶ 31.  This continued through July 2021, at which point Hayes complained again to Molnar that her requests were still being denied.  *Id.* ¶ 32.  Drawing the reasonable inference, as the Court must at this stage, that the ability of an employee to take paid time off is a term or condition of employment, the repeated and unwarranted denial of Hayes' requests constitutes an adverse employment action.

Hayes has also met her "*minimal* burden of showing facts suggesting an inference of discriminatory motivation … ." *Littlejohn*, 795 F.3d at 311.  An inference of discrimination can arise from circumstances including "the more favorable treatment of employees not in the protected group … ." *Id.* at 312 (quoting *Leibowitz v. Cornell University*, 584 F.3d 487, 502 (2d Cir. 2009)).  Remarks made by colleagues may also be probative of discriminatory intent—depending upon the circumstances under which the remarks were made—if there is a nexus between the remarks and the adverse employment action.  *Mesias*, 106 F. Supp. 3d at 438.

Here, Hayes has alleged that non-African American employees were not being denied their requests for PTO, Doc. 13 ¶ 14, and that Winkelmann commented "Black lives don't matter" directly in response to a request for PTO.  Given the "minimal" showing required, Hayes has alleged enough to survive a motion to dismiss.  *Littlejohn*, F.3d at 311.

Accordingly, Hayes has sufficiently alleged a *prima facie* discrimination claim.

**C. Retaliation**

Similar to discrimination claims, "[r]etaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." *Littlejohn*, 795 F.3d at 315; *see also Kirkland-Hudson v. Mount Vernon City School District*, 665 F. Supp. 3d 412, 459 (S.D.N.Y. 2023).

To plead a *prima facie* retaliation claim, a plaintiff must demonstrate (1) that she engaged in a protected activity; (2) of which the employer was aware; and (3) that she suffered a materially adverse action; which (4) was causally connected to the protected activity.  *Brown v. Montefiore Medical Center*, No. 19-cv-11474 (ALC), 2021 WL 1163797, at *10 (S.D.N.Y. Mar. 25, 2021); *Ramirez*, 2021 WL 4392303, at *10.

Hayes alleges that she engaged in protected activity by making multiple complaints of discrimination and as a result, Newmark subjected her to adverse employment actions including a negative performance review and conduct that she

alleges amounted to a constructive discharge.  Doc. 13 ¶ 61.  In response, Newmark argues that Hayes' retaliation claims should be dismissed because she has failed to allege an adverse employment action that was causally connected to any protected activity. Doc. 35 at 20.

    *1.  Protected Activity*

Hayes alleges that she engaged in six protected activities:  (1) she complained to Tara Molnar in July 2020 that she believed Winkelmann was denying PTO requests because of her race, Doc. 37 at 2–3; (2) in December 2020 during a performance review with Flavinn and Winkelmann, Hayes tried to raise a complaint of discrimination against Winkelmann but was prevented from doing so, *Id.* at 4–5; (3) in July 2021 Hayes complained to Molnar again about Winkelmann's continued allegedly discriminatory denials of Hayes' PTO requests, *Id.* at 5; (4) on December 30, 2021, Hayes filed a complaint of discrimination with the EEOC, Doc. 36-2, (5) in February 2022 Hayes and Newmark attended an unsuccessful mediation at the EEOC, Doc. 37 at 7; and (6) in March 2022, Hayes informed Molnar and Crumback that since her complaint and mediation with the EEOC, Winkelmann's retaliatory behavior had gotten worse, *Id.* at 8.

Protected activities are actions taken by an employee that protest or oppose discriminatory conduct by their employer which they believe in good faith to have violated the law.  *See Cruz v. Coach Stores*, 202 F.3d 560, 566 (2d Cir. 2000); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) ("The law protects employees [who] … make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (citation omitted)).

Protected activity can be formal, such as filing a complaint with an administrative agency, or informal.  *See Ramirez*, 2021 WL 4392303, at *10.  An informal complaint can be as simple as an oral objection to the discriminatory conduct that is expressed to the

employer, however, at the very least there must be some form of "professional indicia of a complaint made against an unlawful activity." *Id.* (quoting *Moran v. Fashion Institute of Technology*, No. 00-cv-1275 (KMW), 2002 WL 31288272, at *8 (S.D.N.Y. Oct. 7, 2002) (explaining that telling a supervisor to "stay away" and "leave him alone" did not constitute a protected activity) (citing *Cruz,* 202 F.3d at 566 (explaining that slapping one's harasser, even assuming that it was done in response to unlawful harassment, was not a protected activity))).

Each of Hayes' six listed complaints qualify as protected activity. The first three occasions involve allegations that she specifically told supervisors that Winkelmann was engaging in racially discriminatory behavior. Newmark does not contest that these are protected activities.

Hayes' formal complaint to the EEOC also clearly qualifies as a protected activity. Moreover, this Court has also recognized that participation in an EEOC mediation itself qualifies as a protected activity. *See Erasmus v. Deutsche Bank Americas Holding Corporation*, No. 15-cv-1398 (PAE), 2015 WL 7736554, at *10 (S.D.N.Y. Nov. 30, 2015).

Newmark argues that Hayes' March 2022 complaint to Molnar and Crumback was not a protected activity because Hayes merely made a conclusory assertion that Winkelmann's "retaliatory behavior had gotten worse." Doc. 35 at 23; Doc. 13 ¶ 46. However, when Hayes refers to Winkelmann's conduct as "retaliatory," she is referencing the alleged retaliatory behavior that is specifically identified in the immediately preceding paragraphs. Doc. 13 ¶ 43–46. The Court finds that at the pleading stage Hayes has sufficiently alleged that the March 2022 complaint was also protected activity.

Accordingly, the Court finds that Hayes has sufficiently alleged that she engaged in protected activity.

### 2. *Knowledge of the Employer*

Newmark does not contest that they were aware of Hayes' complaints.

*3. Adverse Action*

An adverse employment action in the retaliation context is different from the discrimination context. *Nnebe v. City of New York*, No. 22-cv-3860 (VEC) (SLC), 2023 WL 9100339, at *16 (S.D.N.Y. Nov. 9, 2023) (citing *Sosa v. New York City Department of Education*, 368 F. Supp. 3d 489, 517 (E.D.N.Y. 2019)). The standards for retaliation and discrimination are not "coterminous" and consequently the scope of adverse actions covered by a retaliation claim may be broader than a discrimination claim. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 66–67 (2006).

In the retaliation context, employment actions are adverse if they are "materially adverse to a reasonable employee." *Id.* at 57. An action is "materially adverse" if it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Ciotti v. City of New York*, No. 23-cv-10279 (ER), 2025 WL 308022, at *17 (S.D.N.Y. Jan. 27, 2025) (quoting *Burlington Northern*, 548 U.S. at 57); *see also Vega v. Hempstead Union Free School District*, 801 F.3d 72, 90 (2d Cir. 2015). Despite the Supreme Court's decision in *Muldrow* loosening the adverse action standard for discrimination claims by discarding the materiality requirement, the distinction between adverse employment actions in the retaliation context and discrimination context was left undisturbed. *Muldrow*, 601 U.S. at 357–58 (explaining that the Court in *Burlington Northern* adopted a different adverse employment action standard for reasons unique to the retaliation context).

The Supreme Court also explained that the standard is objective, but emphasized that the significance of a given act of retaliation "will often depend on the particular circumstances" and that "[c]ontext matters." *Burlington Northern*, 548 U.S. at 69 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (quoting *Onacle v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998))). For example, the

Supreme Court suggested that exclusion of an employee from "a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining" and thus might be actionable. *Burlington Northern*, 548 U.S. at 69.

This standard does not require the Court to review the nature of the discrimination that led to the filing of the charge, but instead focuses on the materiality of the alleged retaliatory action and the perspective of an objectively reasonable person in the plaintiff's position. *Id.* at 69–70.

    *a.  Negative Performance Review*

Hayes argues that her negative performance review in December 2021 was a materially adverse action in retaliation to her engagement in protected activity.  An action is materially adverse if it would dissuade an objectively reasonable employee from making a complaint of discrimination.  *Burlington Northern*, 548 U.S. at 57.  Despite Newmark's argument to the contrary, the Second Circuit has found that "of course, a poor performance evaluation could very well deter a reasonable worker from complaining." *Vega*, 801 F.3d at 92 (citing *Krinsky v. Abrams*, No. 01-cv-5052 (SLT) (LB), 2007 WL 1541369, at *11 (E.D.N.Y. May 25, 2007), *aff'd*, 305 F. App'x 784 (2d Cir. 2009) ("[A] negative evaluation, or the threat of a negative evaluation, while not an adverse action that affects the terms and conditions of employment, might dissuade a reasonable worker from making or supporting a charge of discrimination." (alteration omitted) (internal quotation marks omitted))).  Hayes has sufficiently alleged a materially adverse employment action in the retaliation context because a negative performance review could plausibly dissuade a reasonable employee from filing a complaint of discrimination.

    *b.  Individual Adverse Actions*

Hayes also alleges that immediately after her mediation with the EEOC:  (1) Winkelmann refused to meet with her to discuss her job duties and performance, Doc. 13

24

¶ 44; (2) Winkelmann withheld instructions and deadlines for projects that involved Hayes' job duties, *Id.* ¶ 45; (3) Winkelmann gave Hayes "dummy work" and menial tasks to perform, *Id.*; (4) Winkelmann increased scrutiny of Hayes' work, *Id.*; (5) Winkelmann reported her to Amy O'Brian of HR, *Id.*; (6) Hayes was informed that she was not allowed to communicate with anyone other than Winkelmann, and was warned by Crumback that "if I find out that you have communicated with anyone other than Cheryl [Winkelmann] I will fire you on the spot! I will also fire you immediately, even if you say Hi to anyone!" *Id.* ¶ 46–47; and (7) when Hayes attempted to obtain the contact information for the newly hired Facilities Manager Christine Geitner to discuss her job duties, Winkelmann became irate and informed Hayes not to communicate with Geitner. *Id.* ¶ 48.  Hayes argues that any and all of these actions can form the basis for a retaliation claim.  Doc. 37 at 21.

The question is whether these actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.  However, to determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 227 (2d Cir. 2006)); *see also Vega*, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish Vega for complaining of discrimination."). This is consistent with the Court's instruction in *Burlington Northern* to evaluate acts of retaliation in light of the surrounding circumstances.  *See* 548 U.S. at 69.

The Court finds that at this stage, when viewing the alleged acts in aggregate, Hayes has alleged a materially adverse employment action.  In the three months following Hayes' mediation with the EEOC, Hayes alleges that she was refused meetings

with Winkelmann to discuss her job duties and performance, given "dummy work" and menial tasks, deprived of information necessary to her job, threatened with termination if she spoke to anyone other than Winkelmann, and prevented from obtaining the contact information of a newly hired supervisor. *See* Doc. 13. Although these individual acts may seem minor on their own, considering them together and drawing all reasonable inferences in favor of Hayes, they could plausibly dissuade a reasonable employee from making or supporting a charge of discrimination. *See Xanthakos v. City University of New York*, No. 17-cv-9829 (VC), 2020 WL 5026930, at *7 (S.D.N.Y. Aug. 24, 2020) (denying motion to dismiss for failure to state an adverse action where plaintiff alleged in aggregate that she had not recently received a performance review, was stripped of job responsibilities and reassigned to a smaller project, deprived of information necessary for doing her job, and excluded from or ignored in meetings and office parties); *Schoenadel v. YouGov America Inc.*, No. 22-cv-10236 (AS), 2025 WL 371089, at *9 (S.D.N.Y. Feb. 3, 2025) (denying motion for summary judgement for failure to state an adverse action where plaintiff alleged in aggregate that she was isolated and excluded, not invited to leadership meetings, received infrequent communication with supervisors, and was ignored when requesting information).

   c.  *Constructive Discharge*

The conduct described above also forms the basis for Hayes' argument that she suffered a materially adverse action because she was constructively discharged. Doc. 37 at 18–19. The parties devote a substantial portion of their briefs for this motion to arguing whether Hayes has been constructively discharged, which occurs when an employer intentionally creates a work atmosphere so intolerable that an employee is left with no choice but to resign. *See Petrosino*, 385 F.3d at 229. However, because the alleged conduct forming the basis for the constructive discharge claim is sufficient on its own to plead a materially adverse employment action in the retaliation context, the Court

does not need to decide today whether Hayes' resignation amounted to a constructive discharge.

### 4. Causation

To adequately plead causation, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). But-for causation "does not require proof that retaliation was the only cause of the employer's action," rather, a plaintiff need only establish that "the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan*, 888 F.3d at 625; *see also Cifra v. General Electric Company*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (citation and internal quotation marks omitted)).

### a. Negative Performance Review

Hayes claims that her December 7, 2021 negative performance review was a direct response to the "September 2021 filings with the EEOC." Doc. 37 at 20. As discussed above, the facts before the Court do not support this inference. The EEOC complaint was attached as an exhibit to a declaration filed contemporaneously with the motion and Newmark's memorandum in support. Doc. 36-2. The exhibit shows that Hayes did not file her complaint with the EEOC until December 30, 2021. *Id.* Accordingly, the negative performance review could not have been in retaliation to Hayes filing a charge of discrimination with the EEOC.

### b. Other Adverse Actions

With respect to the other adverse actions alleged by Hayes, she has sufficiently alleged causation. Hayes alleges she was refused meetings with Winkelmann to discuss

her job duties and performance, given "dummy work" and menial tasks, received increased scrutiny of her work, and was deprived of information necessary to her job. *See* Doc. 13. These actions allegedly came "within weeks, if not a month" of Hayes' February 2022 mediation with the EEOC. Doc 37 at 21. Hayes then engaged in protected activity in March 2022 by complaining to her supervisor that Winkelmann was retaliating against her because of her mediation with the EEOC. Doc. 13 ¶ 46. This led to Crumback telling Hayes "if I find out that you have communicated with anyone other than Cheryl [Winkelmann] I will fire you on the spot! I will also fire you immediately, even if you say Hi to anyone!" *Id.* ¶ 47. Finally, in April 2022 Winkelmann then prevented Hayes from obtaining the contact information of a newly hired supervisor. *Id.* ¶ 48.

The Court finds that these allegations support an inference of causation as a result of the temporal proximity between the alleged adverse actions and the protected activity. While the Second Circuit has " 'not drawn a bright line defining … the outer limits beyond which a temporal relationship is too attenuated to establish causation,' … [it has] previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action." *Banks v. General Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)); *see, e.g.*, *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (four months between employment action and protected activity was sufficient to support an inference of a causal connection); *Vega*, 801 F.3d at 92 (holding that an adverse action taken three months after the plaintiff's EEOC complaint was sufficiently close in time to infer retaliatory motive).

Here, several adverse actions by Winkelmann allegedly took place, at most, within a month of Hayes' EEOC mediation, and the remaining adverse actions all took place within three months of the mediation. The Court finds that this brief time period

supports an inference of causation.  Moreover, the inference is strengthened by the fact that Crumback threatened Hayes with termination if she spoke to anyone other than Winkelmann, who was precisely the employee Hayes' believed was discriminating against her.  *See Banks*, 81 F.4th at 277–78 ("Where temporal proximity is not the only evidence that bears on causal connection, we have recognized that the lapse in time between the protected activity and adverse action can be longer.").  Threatening Hayes with termination if she spoke to anyone other than Winkelmann strongly suggests that Crumback was explicitly trying to discourage Hayes from making any further complaints of discrimination.

Accordingly, Hayes has sufficiently alleged a *prima facie* case of retaliation.

## IV.    CONCLUSION

For the foregoing reasons, Newmark's motion is DENIED.  The parties are directed to appear for a conference on April 8, 2025 at 11:30 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.  The Clerk of the Court is respectfully directed to terminate the motion, Doc 34.

It is SO ORDERED.

Dated:    March 10, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.